SPEECE, Plaintiff-Appellee, v INDUSTRIAL COMMISSION, Defendant-Appellant.

Ohio Appeals, Seventh District, Belmont County.

No. 795. Decided September 29, 1945.

454

Thomas F. Joseph, Martins Ferry, and Thornburg & Lewis, St. Clairsville, for Plaintiff-Appellee.

Hugh S. Jenkins, Attorney General, and C. G. L. Yearick, Assistant Attorney General, Columbus, for Defendant-Appellant.

## OPINION

By PHILLIPS, J.

Defendant appeals on questions of law from a judgment of the court of common pleas overruling its motion for a new trial in plaintiff's action filed in that court on behalf of herself and two minor children to recover benefits for the death of her decedent; and appeals from the judgment of that court entering judgment upon a jury verdict finding plaintiff entitled to participate in The Workmen's Compensation Fund.

Either the allegations of plaintiff's petition admitted as true by defendant's answer, the uncontradicted evidence of the respective parties or the stipulation of their counsel disclose that for some years prior to and on January 21, 1941, plaintiff's decedent was a regular employee of the City of Martins Ferry, Ohio, a municipal corporation amenable to the Workmen's Compensation Law of Ohio; that for several days prior thereto and on that date he was suffering with a head cold; that while acting within the course and scope of his employment as a lineman in the Electric Division of that city he was required to climb a tree and to assist in cutting branches therefrom at a distance of approximately eighty-five feet above the ground where he worked nearly three hours during a time when the temperature on that day varied between 8:00 A. M. and 4:00 P. M. from 13° to 40° Fahrenheit; that on January 23, 1941, "plaintiff's decedent committed suicide by jumping from a bridge in the Ohio River and was drowned"; that he left surviving him the plaintiff and two minor children wholly dependent upon him for support; that the necessary procedural steps were taken in, and upon rehearing plaintiff's claim was disallowed by the Industrial Commission.

Plaintiff claims that "by reason of his (plaintiff's decedent's) exposure to the forces of nature, or the elements, the ailment from which he was suffering was aggravated and that he (contracted encephalitis) became insane and committed suicide as a proximate result of the aggravation of said ailment."

Defendant denies that claim and contends that "the court erred in refusing to permit the defendant to try this case as other civil actions are tried and in ruling upon objections to questions and answers before the same were asked and answered"; "in excluding evidence offered on behalf of defendant, particularly the hypothetical questions

asked the expert witnesses, such as Doctor Secrest, whose testimony reveals that he laid no stress whatever on the fact that decedent drove his car to the bridge from which he jumped, and that he was not even cross-examined in regard thereto"; "in refusing to give the interrogatories requested by defendant"; "in giving the special charges before argument requested by plaintiff"; and claims that "the verdict of the jury is manifestly against the weight of the evidence" and "is contrary to law", and that there are "other errors apparent upon the face of the record."

The hypothetical question submitted to witness Secrest, and incidentally to other defense medical witnesses, contained the following uncontradicted statement:—

"That on the evening of January 23rd, he walked out of the house with a stary expression in his eyes, passed both of his children gave neither of them any attention."

That statement was followed by this statement:

"That he drove his car to a position near the river, parked it upon the street, locked the car and committed suicide by drowning by jumping from the bridge."

In his opinion overruling defendant's motion for a new trial the trial judge stated:—

"It is conceded that there is no evidence, by inference or otherwise, that the decedent drove his car to the river or parked it upon the street and then locked the car. One of the important issues in this case is whether or not there was a causal relationship between the injury, if any, and the suicide; whether or not the decedent was capable or incapable of realizing the nature of his act of suicide or was capable or incapable of entertaining a fixed purpose to commit suicide, and whether or not the suicide was the direct result of that lack of purpose which characterizes an insane mind.

"The testimony of (plaintiff's witness) Dr. Wanner employs almost this identical language in his answer to the hypothetical question, the answer being:
" 'I believe that the encephalitis produced such mental changes as to make this man incapable of realizing the na-

ture of his act of suicide and to render him incapable of entertaining a fixed purpose to commit suicide. Finally, I believe that the act of suicide was the direct result of the lack or distortion of purpose which characterizes an insane man.'

"The issue being the state of mind of the decedent, the court is impressed with the importance of the statement contained in the hypothetical question which was not warranted by the evidence.

"It occurs to the Court that if one had sufficient intelligence to drive his car to a point on the street near the river, park the car on the street, lock the car, and then proceed with the act of committing suicide, that that would be substantial evidence warranting the assumption that the decedent had a fixed purpose, and there being no foundation in fact for any such assumption, the conclusion of the court was and is, not only that the question was improper, but that it should not be read to the jury, because the mere reading of the question would suggest to the jury that something material happened that was not in evidence. The Court is well aware that in the trial of the ordinary law suit, such question would have been submitted in the presence of the jury, but that only because the court could not have had opportunity to rule on the merits of the question until after its submission. In this case, the evidence being transcribed and limited to what was contained in the record, a different rule should * * * apply.

"In the case of **Haas, et al v Kundtz, 94 Oh St 238,** the court simply says that 'The failure which justifies rejection must be a failure in some one or more important data, not merely in a trifling respect.' The Court feels that the objectionable matter referred to, contained in the hypothetical questions in this case are matters of decided substance, and such as would warrant the rejection of not only the question but the answer predicated upon that assumption, and that for the reason that the witnesses is supposed to weigh and consider every proposition contained in the questions as being true."

I am so impressed by the reasoning of the trial judge in disposing of two of defendant's assigned grounds for a new trial that in disposing of these two of defendant's assigned grounds of error which are couched in almost the identical language used in the grounds for a new trial in the court of common pleas that I have quoted verbatim his lan-

guage setting forth his reasons for overruling defendant's motion for a new trial on the grounds to which reference is made.

I believe the reasoning of the trial judge is sound and is supported by authorities on the questions presented in these assigned grounds of error. And speaking strictly for myself I adopt as my own that reasoning in reaching the conclusion concurred in by my associates that the trial judge did not err prejudicially to defendant as claimed by it in these grounds of error.

We believe that the rule thus announced by the trial court that where the questions and answers to which objection is made are before the trial by record that there is no necessity to read the questions or answers in the presence of the jury before the court rules upon same.

As far as we can ascertain from the manner in which defendant numbered special interrogatories offered by it for submission to the jury, it appears that the trial judge refused to submit defendant's interrogatories numbered two to seventeen inclusive to the jury for answer in writing. We have examined these interrogatories, which we cannot set forth herein and keep the length of this opinion within reasonable bounds. Accordingly, we must be content with saying that if all of the rejected interrogatories had been submitted to the jury and been answered favorably to defendant that in our opinion such interrogatories and answers either individually or collectively would not have controlled the verdict of the jury.

Special verdicts are always efficient means of ascertaining the truth and determining the mental reasoning of the jury, but should not be employed except when the answers thereto would be determinative and controlling as to the main issue.

While all of the interrogatories are couched in concise language, yet, we believe some of them present intricate questions demanding knowledge possessed by experts in specialized fields of medicine to answer intelligently. As far as the record discloses the jury which returned the verdict in this case was a lay jury, and since we believe that some of the less involved and apparently simple interrogatories could not be answered without answering the more involved ones and that the answer to any one might reflect itself in the answer to any or all of the others in our opinion it would be difficult, if not impossible, for the jury to answer some of the proffered interrogatories intelli-

gently or with any degree of certainty as to the correctness of its answers. It is believed that for this reason, if no other, the trial judge was warranted in refusing to submit the rejected interrogatories to the jury.

Upon request of plaintiff the trial judge charged the jury in writing before argument the following proposition of law:—

"You are further instructed that an act of God does not arise out of earthly employment, but if the employment through its activities, conditions or environments, subjects an employee to a greater hazard from the act of God than to which the general public in the community is subjected, and the employee is injured by the act of God to which he is so subjected, and which injury causes his death, then a causal connection between the employment and the death is thereby established, and the case is compensable under the Workmen's Compensation Law."

Counsel for defendant claims "clearly this charge was improper and it was certainly prejudicial to defendant."

With reference to this assignment of error we believe that if the record had disclosed any dispute as to whether if plaintiff's decedent received any injury on January 23, 1941, as claimed by plaintiff that such injury was received while he was acting within the course and scope of his employment that the court would have committed error in submitting plaintiff's request to charge before argument to the jury, but in the absence of such dispute we can not reach that conclusion.

In the case of **Industrial Commission of Ohio v Brubaker, 129 Oh St 617,** the Supreme Court announced the rule that in order to recover benefits for the death of a decedent by suicide a claimant must establish that decedent's claimed injury was sustained in the course of decedent's employment; that the injury produced mental derangement to the extent that the decedent could not entertain a fixed purpose to take his or her own life; and that suicide was the direct result of that lack of purpose that characterizes an insane mind.

As stated heretofore, it is admitted that if plaintiff's decedent received any injury on January 23, 1941, as claimed by plaintiff, that such injury was received while he was act-

ing within the course and scope of his employment so that the evidence relating to that part of the rule announced by the Supreme Court in Industrial Commission of Ohio v. Brubaker, supra, need not be further discussed or weighed.

All men are presumed to be sane until they are proven insane and the fact that plaintiff's decedent committed suicide raises no presumption that he was insane when he ended his life.

In the cases to which counsel have directed our attention and those we have been able to find as the result of individual research there is evidence of a well defined traumatic injury of some kind so that that fact was removed from the field of conjecture or opinion.

In this case the only evidence as to whether plaintiff's decedent suffered a traumatic injury is circumstantial in nature supplemented by opinions of expert medical witnesses.

One of plaintiff's medical experts testified that in his opinion there was a direct causal relationship between the exposure of plaintiff's decedent to the forces of nature or elements and decedent's act of suicide; that at the time plaintiff's decedent committed suicide he was incapable of entertaining a fixed purpose to commit suicide, that he was incapable of realizing the nature of his act and that his suicide was the direct result of the lack of purpose which characterizes an insane mind.

Two of plaintiff's other medical witnesses testified that in their opinions plaintiff's decedent was suffering from a head cold and sinus infection which conditions were aggravated by exposure which resulted in insanity.

One of those two witnesses testified that in his opinion there was a direct relationship between the exposure plaintiff's decedent suffered and his death; that decedent developed a mental condition and because of that condition, he jumped from a bridge into the Ohio River and was drowned. This witness offered no opinion as to the capability or incapability of decedent to entertain a fixed purpose to commit suicide, or whether his suicide was the result of that lack of purpose which characterizes an insane mind.

One of defendant's medical expert witnesses testified that exposure to the forces of nature or the elements aggravated a common cold which might progress to the point where a brain abscess developed; that encephalitis is usually acute and aggravated by physical exposure; that its symptoms are vomiting, feeling of lassitude, lethargy and drowsi-

ness; that it might produce whole or partial paralysis and change of personality. There is no evidence that plaintiff's decedent suffered from a brain abscess or any of the symptoms of encephalitis enumerated above with the exception of vomiting and a change of personality during the last week of his life. This witness further testified that mental depression was one of the most common causes of suicide and that depression psychosis is demonstrated by slowness, inactivity and depression. There is no evidence in the record submitted to us that plaintiff's decedent was inactive or slow in his movements immediately prior to his death. On the contrary, there is abundant evidence that on January 21, 1941, for at least three hours plaintiff's decedent was very actively engaged in work, the nature of which has been stated hereinbefore. There is evidence that during that time he was depressed to such an extent that on the afternoon of his death on January 23, 1941, he made inquiry of a fellow worker who had pursued a course in pre-medical studies as to the part of the body where an individual would have to shoot himself to produce death.

One of defendant's other medical witnesses testified that in his opinion cold weather caused the body to chill; that exposure in cold weather aggravated a common cold, but that if an individual was obliged to be exposed to cold weather under such circumstances bodily activity would help rather than hinder a cure; that sinus infections cause headaches and that depression psychosis was the most common cause of headaches; that some of the symptoms of encephalitis are severe headache and insomnia. There is evidence that plaintiff's decedent suffered from severe head pains and tossed in his sleep during the time he suffered from a head cold.

Defendant's third medical expert testified that a head cold affected the head, ears and brain, and that an aggravated head cold could be followed by a meningeal infection; that it is believed that encephalitis is preceded by symptoms of a common cold; that insomnia is one of the symptoms of encephalitis; that paralysis of the arms and legs or speech are not always affected in mind cases of encephalitis under which conditions a sufferer from a mild encephalitis might be able to work; that from the description of plaintiff's decedent furnished to him he believed that he suffered from a mild form of manic depressive psychosis.

"Since the issue of causal connection between an injury to a person's back and his subsequent death from cancer of

the liver involves a scientific inquiry, such causal connection must be established by the testimony of medical witnesses competent to testify on this subject.

"Testimony that a person's death from cancer of the liver could have resulted from a previous injury to his back is insufficient to prove causal connection between such injury and death. The proof in such case must establish a probability, not a mere possibility of such causal connection." **Drakulich, Appellee, v Industrial Commission of Ohio, Appellant, 137 Oh St 82.**

Only one of six medical experts who testified for the respective parties stated that in his opinion there was a direct causal relationship between the exposure of plaintiff's decedent to the forces of nature or the elements and decedent's act of suicide. None of the other medical expert witnesses went that far.

As suggested by the trial judge this "is an extreme borderline case," and it is possible that if the duty had been imposed upon me in the first instance of determining the issues presented in this case by the evidence that I might have reached a conclusion opposite to that at which two juries arrived, both of which returned verdicts favorable to the plaintiff. However it is believed that questions for the determination of the jury are presented, and since this court cannot arrive at the unanimous conclusion that the verdict of the jury is against the manifest weight of the evidence the judgment of the trial judge cannot be reversed on that urged ground.

Counsel has not called our attention to "other errors apparent upon the face of the record." Accordingly, we do not pass upon that assigned ground of error.

It is obvious from what we have said that we do not believe that the verdict of the jury and judgment of the trial judge entered thereon are contrary to law.

The judgment of the court of common pleas is affirmed.

CARTER, PJ, NICHOLS, J, concur in judgment.